## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CELESTE FLYNN,** *Individually and as Personal Representative of the Estate of Nathan E. Flynn*, et al., <br><br> Plaintiffs, <br><br> *v.* <br><br> **OMEGA FLEX, INC.,** <br><br> Defendant. | **CIVIL ACTION** <br><br> **NO. 2:20-cv-3082-KSM** |

## <u>MEMORANDUM</u>

**MARSTON, J.**                                                                 **June 9, 2022**

This is a products liability case, involving claims for wrongful death and survival under Maryland law.  The parties have reached a confidential settlement of Plaintiffs' claims and Plaintiffs now petition for the Court's approval of the settlement amount and the allocation of funds.  (*See* Doc. Nos. 46, 48.)  For the reasons discussed below, the proposed settlement is approved.

### I.    BACKGROUND

#### A.    *The Lawsuit*

On July 23, 2018, Nathan E. Flynn, a firefighter with the Howard County Fire Department, responded to a fire at a house in Clarksville, Maryland.  (Doc. No. 1 at ¶¶ 69, 70.)  Shortly after Flynn entered the home, the floor collapsed beneath him, trapping him in the basement level crawl space, where there was an active fire and extreme heat conditions.  (*Id.* at ¶ 70.)  It was 22 minutes before the intervention team rescued Flynn, and he was taken to the hospital in critical condition.  (*Id.* at ¶¶ 71–73.)  Tragically, Flynn died shortly after arriving at

the hospital, leaving behind a widow, Plaintiff Celeste Flynn, and three minor children, Plaintiffs T.F., C.F., and B.F.[1]  (*Id.* at ¶¶ 2, 5, 7, 9.)

On June 19, 2020, Celeste Flynn filed this action in the Court of Common Pleas of Philadelphia County in her individual capacity, as personal representative of the Estate of Nathan E. Flynn, and on behalf of T.F., C.F., and B.F.  (*Id.* at ¶¶ 1, 3, 4, 6, 8.)  The complaint asserts products liability claims sounding in strict liability and negligence, along with claims for wrongful death and survival, against Defendant Omega Flex, Inc.  (*See generally id.*)  Omega Flex designed, manufactured, and sold the corrugated stainless-steel tubing ("CSST")—sold under the brand name TracPipe—that transported propane gas into the home.  (*Id.* at ¶¶ 60–61.) Celeste contends that the house fire began when lightning struck and perforated the TracPipe, causing propane gas to leak and eventually ignite.  (*Id.* at ¶¶ 64–68.)  She claims that Omega Flex knew that TracPipe was susceptible to lightning-induced failures but continued to sell the product "because it did not want to lose market share."  (*See, e.g.*, *id.* at ¶¶ 55, 57.)  And despite knowing that TracPipe caused up to 75 lightning-induced fires per year and "could unexpectedly compromise floors in homes," Omega Flex did not issue any warnings to its customers or to the firefighting community.  (*Id.* at ¶¶ 47, 57, 63.)

On June 24, 2020, Omega Flex removed the case to this Court (Doc. No. 1-1) and moved to dismiss the complaint as barred by Maryland's Fireman's Rule (Doc. No. 5).  After considering the parties' choice of law arguments, the Court found that Maryland law applied but denied the motion to dismiss.  (*See* Doc. No. 33.)  We did, however, note that "Omega Flex may continue to raise the fireman's rule as a defense to liability if, after discovery, Plaintiffs are

---

[1] Flynn also leaves behind two adult stepchildren.  Although he did not legally adopt either child, he helped to raise them and was helping them pay for college at the time of his death.  (Doc. No. 48 at p. 5.)

unable to show that Omega Flex's actions were willful and wanton." (*See* Doc. No. 33 at p. 13.) While the motion was pending and in the months after the Court issued its ruling, the parties proceeded through extensive fact and expert discovery. (Doc. No. 48 at ¶¶ 15–26, 30–31.) On February 1, 2022—one month before the deadline for exchanging expert reports—the parties conducted a mediation before retired Maryland Judge Carol E. Smith, and at the conclusion of mediation, reached a confidential settlement of all claims. (*Id.* at ¶¶ 34–35.) Plaintiffs now petition for approval of the settlement amount and the proposed allocation of settlement funds.[2] (*See generally* Doc. Nos. 46, 48.)

### B.    *The Settlement*

Under the terms of the proposed settlement, Plaintiffs will receive a lump sum to be allocated on a 66.6%–33.3% basis with their counsel.[3] (Doc. No. 48.) Pursuant to Plaintiffs' contingent fee arrangement with counsel, litigation costs and expenses incurred in pursuing this matter will be deducted from Plaintiffs' 66.6% allotment. (*Id.* at p. 3.) The remainder of Plaintiffs' allotment will then be allocated 85% to the wrongful death action and 15% to the survival action, with each amount further allocated among the four Plaintiffs. (*Id.*)

The settlement proceeds allocated to T.F., C.F., and B.F. will be held in an investment account at Wells Fargo Clearing, LLC and will be invested in a conservative, long term allocation of growth and dividend bearing investments. (Doc. No. 46 at ¶ 42.) Mark Youngs of Ad Astra Wealth Advisors will serve as investment manager and fiduciary of the account, and Celeste Flynn will serve as the Custodian/Guardian until each child reaches the age of 21, at

---

[2] Omega Flex has no objection to Plaintiffs' petition. (*See* Doc. No. 46 at ¶ 44.)

[3] The Court will not disclose the exact terms of the settlement here, as the petition and its supporting documents were filed under seal and there is a confidentiality clause in the settlement agreement itself. (*See* Doc. No. 45.)

which point he or she will assume control of his or her individual account.  (*Id.* at ¶ 43.)

## II.   DISCUSSION

### A.   *The Settlement*

"No claim of a minor . . . shall be compromised, settled, or dismissed unless approved by the court."  E.D. Pa. Local R. 41.2(a).  In determining whether to approve a settlement made on behalf of a minor, a court must assess "whether the settlement amount is fair and in the best interests of the minor."  *Henderson ex rel. Bethea v. Nationwide Mut. Ins. Co.*, No. 00–1215, 2001 WL 43648, at *3 (E.D. Pa. Jan. 4, 2001).  A court must consider the parties' petition for approval of the settlement, which "should include all relevant facts and the reasons why the minor's guardian believes the settlement is desirable and why it is in the minor's best interest to settle the action."  *Lee v. Victoria's Secret, LLC*, No. Civil Action No. 10–3662, 2012 WL 628015, at *2 (E.D. Pa. Feb. 27, 2012).  "Courts should give 'considerable weight' to the judgment of the parties and counsel, as they are 'typically in the best position to evaluate the settlement.'"  *Id.* (quoting *Henderson ex rel. Bethea*, 2001 WL 43648, at *2)).  In determining whether the settlement amount is in the best interest of T.F., C.F., and B.F., we consider both the overall settlement amount and the allotment between Celeste Flynn and her minor children.

### 1.   <u>Settlement Amount</u>

This settlement is the result of years of discovery and a mediation before a private mediator with considerable experience in resolving complex civil claims.  (Doc. No. 48 at p. 2.) It is a substantial recovery that goes well above the highest settlement offer given by Omega Flex prior to mediation.  Moreover, as the Court's opinion on the motion to dismiss explained and Plaintiffs now concede, "the substantive law of Maryland imposes a significant hurdle to recovery on behalf of the Plaintiffs," with Maryland's fireman's rule serving as a complete bar to any recovery unless Plaintiffs can show that Omega Flex acted with willful and wanton disregard

4

to a known, hidden danger.  (*Id.* at p. 5.)  Assuming that Plaintiffs survived summary judgment and proceeded to trial, they faced "considerable expenses in moving forward with this litigation," including the "expenses associated with preparing [ ] experts for trial and presenting them at trial."  (*Id.* at p. 6.)  There is no certainty that Plaintiffs would prevail at trial, and even if they did, there is no guarantee that the jury would award them the substantial sum that they will receive in this settlement.  Even then, any recovery would likely be delayed through appeal.  Given the costs and risks associated with continuing litigation, the Court finds that the settlement amount is more than reasonable.

### 2.   Allocation Among Claims and Plaintiffs

The proposed allocation between the wrongful death claim and survival claim and the allocation between Celeste Flynn and her three minor children are also reasonable.

### a.   Allocation Among Claims

Eighty-five percent of the net settlement proceeds is allotted to the wrongful death action, and the remaining fifteen percent is allotted to the survival action.  As an initial matter, we find this allocation reasonable because the bulk of Plaintiffs damages are attributable to the wrongful death claim.  Maryland's Wrongful Death Act provides a cause of action for the surviving spouse and children of a decedent, allowing the decedent's beneficiaries to recover damages for the injuries they incur as a result of the wrongful death.  Md. Cts. & Jud. Proc. § 3-904(a), (c)(1).[4] Damages under this statute include pecuniary loss as well as mental anguish, emotional pain and suffering, loss of companionship, and loss of parental care.  *Id.* § 3-904(d).  Maryland's Survival Act, by contrast, is meant to compensate the victim's estate for the pain, suffering, and any other

---

[4] Local Rule 41.2 "is procedural, and other federal judges applying it have looked to state law to determine the fairness of the proposed settlement."  *Lee*, 2012 WL 628015, at *2 (collecting cases).

damages experienced by the victim up to the moment of death.  *See* Md. Code Ann. Est. & Trusts §7-401(y).

Plaintiffs argue that the proposed allotment is reasonable in light of the damage the Flynn family has suffered and will continue to suffer as a result of Nathan Flynn's death.  (Doc. No. 46 at ¶¶ 32, 34.)  We agree.  Nathan Flynn was 34 years old when he died, and in addition to the emotional impact Plaintiffs experienced in losing a husband and father, they have also lost the benefit of his earnings, healthcare benefits, pension, retirement benefits, and household services. (*Id.* at ¶ 32.)  Given the loss experienced by the Flynn family, an 85% allotment to the wrongful death claim is reasonable.  And although the survival action is entitled to a smaller percentage award than the wrongful death claim, we do find some percentage warranted given the pain and suffering that Nathan Flynn experienced while trapped in the subfloor of the burning home.  The Court is satisfied that an allotment of 15% is sufficient to both acknowledge this pain and suffering while still providing an appropriate recovery for his beneficiaries under the Wrongful Death Act.

### b.      Allotment Between Plaintiffs

The Court is also satisfied with the proposed allotment among the Plaintiffs.  For recovery under the Wrongful Death Act, Plaintiffs propose awarding approximately 93% of the award to Celeste Flynn, and splitting the remaining 7% among T.F., C.F., and B.F.  (*See* Doc. No. 46 at ¶ 35.)  Although this recovery weighs disproportionately in favor of Celeste Flynn, we do not find it unreasonable.  The three minor Plaintiffs were all under the age of five when Nathan Flynn died, meaning Celeste Flynn not only lost her husband but also faces the reality of raising three small children on her own.  (*See id.* at ¶ 11.)  Moreover, each minor child is recovering 1/6 of the award under the Survival Act, and the Honor Every Responsible Officer's Eternal Sacrifice Inc. foundation has committed to paying 100% of the undergraduate tuition

expenses for T.F., C.F., and B.F., including tuition, room and board, meal plan, fees, and books to the college or trade school of their choice.  (Doc. No 46-7.)  Given the specific facts of this case, the Court finds reasonable the proposed allotment under the Wrongful Death Act.

As for the proposed allotment under the Survival Act, we note that Maryland law outlines the appropriate distribution of any award, providing that the surviving spouse's share "shall be one-half" of the award, with the remaining half to be "divided equally among the surviving issue."  Md. Estates & Trusts §§ 3-102(b), 3-103.  The proposed allotment follows the statutory distribution.

* * *

In short, the parties and counsel agree that settlement is fair and in T.F., C.F., and B.F.'s best interest, and considering the circumstances of the case, the Court agrees.

### B.      *Attorneys' Fees*

Likewise, "[n]o counsel fee . . . shall be paid out of any fund obtained for a minor . . . as a result of a compromise, settlement, dismissal or judgment unless approved by the court."  E.D. Pa. Local R. 41.2(c).  "There is no question that competent attorneys should be compensated for their services," and attorneys who work on contingency fees run a risk by accepting cases without any guarantee of payment; however, a court has discretion to adjust the amount of counsel fees to be paid out of a settlement fund for a minor, even when a contingency arrangement is in place.  *See Nice v. Centennial Area Sch. Dist.*, 98 F. Supp. 2d 665, 670 (E.D. Pa. 2000); *Lee*, 2012 WL 628015, at *3.

In determining the reasonableness of attorneys' fees in a contingency case, Maryland courts look to "Rule 1.5 of the Maryland Rules of Professional Conduct, which . . . requires that a lawyer's fee be reasonable and which sets out factors to be considered in determining the reasonableness of a fee."  *Friolo v. Frankel*, 819 A.2d 354, 370 (Md. 2003) ("In focusing on the

7

lodestar approach, or indeed, any other, we mut be mindful of Rule 1.5 of the Maryland Rules of Professional Conduct . . . which sets out factors to be considered in determining the reasonableness of a fee.  Most of them are identical or similar to the factors enumerated in *Johnson* . . . , which the *Hensley* Court indicated were relevant even in a lodestar analysis."); *see also Admiral Mortg., Inc. v. Cooper*, 745 A.1026, 1036 & n.13 (Md. 2000) (explaining that the federal system uses the lodestar approach, but "[i]n Maryland" determining an attorney's reasonable hours and reasonable rate "would include consideration of the factors set forth in Rule 1.5 of the Maryland Rules of Professional Conduct"); *Atty. Grievance Comm'n of Maryland v. Korotki*, 569 A.2d 1224, 1233 (Md. 1990) ("When the principal amount of Korotki's still contingent, 40% fee became quantified, it remained subject to the prohibition against clear excessiveness and to testing for reasonableness under the factors, including the risk of the contingency, listed in DR 2–106[5], as well as under other relevant factors.").  Rule 1.5 outlines eight factors:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;

> (3) the fee customarily charged in the locality for similar legal services;

> (4) the amount involved and the results obtained;

> (5) the time limitations imposed by the client or by the circumstances;

---

[5] The text of DR 2–106 is identical to the text of Rule 1.5.  *Compare Friolo*, 819 A.2d at 370 n.3, *with Atty. Grievance Comm'n*, 569 A.2d at 1226 n.1.

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the attorney or attorneys performing the services; and

(8) whether the fee is fixed or contingent.

Md. Atty's R. Prof. Conduct 19-301.5(a); *see also id.* cmt. 3 ("Contingent fees, like any other fees, are subject to the reasonableness standard of section (a) of this Rule."). Here, Plaintiffs entered a contingency fee arrangement with counsel, under which counsel fees would be calculated at a rate of one-third of Plaintiffs' gross recovery. (*See* Doc. No. 46-4 at p. 2.) We find this contingency fee reasonable under the factors outlined in Rule 1.5.

Plaintiffs' counsel has been representing Plaintiffs since August of 2018—three and a half years at the time of the parties' mediation. During that time, counsel dedicated substantial time to the factual and legal issues in this case. Notably, Plaintiffs' counsel were required to attend five examinations of the property where the fire took place, review over 68,000 documents produced by Howard County and Omega Flex in response to discovery requests, and assist in the development of multiple expert reports on fire science, engineering, arc physics, electrical engineering, metallurgy, and the economic impact of Nathan Flynn's death. (Doc. No. 48 at pp. 12, 14.) In addition to time spent investigating the factual issues specific to this case, counsel were also required to research unique legal questions on choice of law and the nature of liability in Pennsylvania and Maryland for injuries to firefighters.

Although this case had nuanced factual and legal questions, Plaintiffs' counsel have significant experience litigating products liability claims and in particular, litigating claims involving CSST, which is the product at issue in this case. Indeed, the two attorneys who spent the majority of time on this case have individually handled between 75 and 100 CSST cases and are co-chairs for their firm's Corrugated Stainless Steel Task Force. (Doc. No. 48 at ¶ 13.) Last,

although we are not relying on the lodestar approach as our benchmark for reasonableness, we do find it telling that if Plaintiffs' counsel were compensated at their standard hourly billing rates, the total is only 3% off from the total compensation that counsel will receive under the contingency calculation.[6]  Given the factual and legal complexities of this case, and the high likelihood that the entire case could have been barred under Maryland's fireman's rule, Plaintiffs' counsel risked not recovering any of their substantial fees when they took it on contingency.  *See City of Burlington v. Dague*, 505 U.S. 557, 560–61 (1992) ("Under the most common contingent-fee contract for litigation, the attorney receives no payment for his services if his client loses.  Under this arrangement, the attorney bears a contingent risk of nonpayment that is the inverse of the case's prospects of success:  if his client has an 80% chance of winning, the attorney's contingent risk is 20%.").

Considering the Rule 1.5 factors together, the Court finds that the circumstances of this case support a 33.3% allocation for attorneys' fees.  This allocation is fair and reasonable, and in Plaintiffs' best interests.

## C. *Case Expense Reimbursement*

Finally, "[n]o . . . costs or expenses shall be paid out of any fund obtained for a minor . . . as a result of a compromise, settlement, dismissal or judgment unless approved by the court."  E.D. Pa. Local R. 41.2(c).  Plaintiffs' counsel advanced a large amount of money in expert fees and other expenses during the course of this litigation.  (*See* Doc. No. 48 at p. 14.)  As mentioned

---

[6] Plaintiffs' counsels' hourly rates are consistent with those charged by attorneys in the community with similar experience.  In fact, the hourly rates for Mr. Utke, Mr. Morrone, and Mr. Duffey are below the rate charged by attorneys in the community with similar experience.  *See* https://clsphila.org/about-community-legal-services/attorney-fees/ (last visited May 24, 2022).  In addition, a contingency fee of 33.3% is consistent with that typically charged in the community.  *Cf. Atty. Grievance Comm'n*, 569 A.2d at 1236 ("The testimony presented to Judge Levitz would support a finding that the customary contingent fee in personal injury cases which are tried is thirty-three and one-third to forty percent.").

above, at the time of the settlement, Plaintiffs' experts had drafted their expert disclosures, which contained a complete summary of their opinions and the basis supporting those opinions.  (*Id.* at p. 15.)  Although the costs for expert fees are steep, Plaintiffs' counsel were able to reduce the overall fees charged by their expert metallurgist by splitting those fees with the attorneys pursuing claims on behalf of Travelers Insurance Company in a related case.  (*Id.*)  And notably, the settlement avoids the incursion of additional litigation expenses and expert fees, which Plaintiffs' counsel estimates to be in the range of $150,000 to $175,000.  Last, Plaintiffs' counsel discounted the costs incurred for charges related to legal research by around $9,000.  (*Id.*)  The Court finds the costs reasonable.

## III.    CONCLUSION

In sum, we find that Plaintiffs' proposed settlement and apportionment of settlement funds is adequate, fair, and reasonable under the circumstances.  An appropriate order follows